IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

_____
                                        )
UNITED STATES OF AMERICA,               )
                                        )
                      Plaintiff,        )
v.                                      )  Cr. No. 16-00556 JMS
                                        )
WILLIAM NOTYCE,                         )
                                        )
                      Defendant.        )
_____ )

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

For the reasons set forth below, the Court DENIES
Defendant Notyce's Motion to Suppress Evidence, ECF No. 92.

### BACKGROUND

Defendant William Notyce ("Defendant") is charged with
two drug trafficking crimes related to the distribution of
controlled narcotics in August 2016. The U.S. Postal Inspector
("USPI"), the Honolulu Police Department ("HPD"), and the Drug
Enforcement Agency ("DEA") jointly conducted the investigation
that led to Defendant's arrest.

On September 7, 2016, Defendant was indicted by a
grant jury on two counts: (1) knowingly and intentionally
conspiring to distribute and to possess with intent to
distribute 500 grams or more of mixture or substance containing
a detectable amount of methamphetamine, its salts, isomers, and
salts of its isomers, a Schedule II controlled substance, in
violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) (Count 1;

and (2) knowingly and intentionally distributing, possessing
with intent to distribute, and attempt to possess with intent to
distribute, 500 grams or more of a mixture or substance
containing a detectable amount of methamphetamine, its salts,
isomers, and salts of its isomers, a Schedule II controlled
substance, in violation of 21 U.S.C. §§ 841(a)(1) and
841(b)(1)(A) and 18 U.S.C. § 2 (Count 2).[1]  A jury trial is
scheduled for November 28, 2017.

    On August 3, 2017, Defendant Notyce filed his Motion
to Suppress Evidence ("Defendant Motion").  ECF No. 92.  On
August 21, 2017, the Government filed its Response to
Defendant's Motion to Suppress.  ECF No. 105.  On October 23,
2017, Defendant Notyce filed a Notice of Partial Withdrawal of
Motion to Suppress, withdrawing the motion to suppress evidence
related to Exhibit 2 (the parcel search warrant) and Exhibit 3
(the beeper warrant).  ECF No. 118.  On October 26, 2017, the
parties filed a stipulation of facts for purposes of the hearing

---

[1] Defendant Keith Matsuda and Defendant Chaes Yanagihara
were also indicted by a grand jury for the same charges.  On
June 30, 2017, Defendant Matsuda entered a plea of guilty as to
Count 1.  ECF No. 86.  After Defendant Matsuda is sentenced, the
Government will move to dismiss Count 2 of the indictment as it
relates to him.  ECF No. 87 at 2.  On August 10, 2017, Defendant
Yanagihara entered a plea of guilty as to Count 1.  ECF No. 100.
After Defendant Yanagihara is sentenced, the Government will
move to dismiss Count 2 of the indictment as it relates to him.
ECF No. 103 at 2.

on the suppression motion.  ECF No. 131.  An evidentiary hearing
on the suppression motion was held on October 27, 2017.

## DISCUSSION

On August 2, 2016, the United States Postal Inspection
Service was conducting an inbound profiling operation at the
Honolulu Mail Processing and Distribution Center.  Stipulation,
ECF No. 131 ("Stip.") ¶ 1.  A United States Postal Inspector
("USPI") examined a parcel, weighing approximately six pounds
and six ounces, which had been mailed from California to a post
office box in Honolulu.  Id. ¶¶ 2-3.  A USPI observed several
characteristics of the parcel that his training and experience
showed him were characteristics of mailings containing
controlled substances, including, inter alia, where the parcel
was sent from, the use of tape around the main seam, and other
densely packed items inside the parcel which were revealed when
he shook it.  Id.  In addition, the USPI searched the sender and
addressee information of the parcel through known law
enforcement databases and found that the name on the return
address was not associated with the address listed.  Id. ¶ 3.
The parcel was identified as potentially containing illegal
substances and the postal inspector prepared an affidavit at
approximately 8:15 p.m. on August 2, 2016.  Id. ¶ 1.

At approximately 8:36 p.m. on August 2, 2016, the
parcel was sniffed by the HPD's narcotics detector canine.  Id.

¶ 4. The canine exhibited a change in behavior consistent with the detection of a controlled substance's odor. Id. Thereafter, an application for a search warrant for the parcel was prepared.

At approximately 1:50 p.m. on August 3, 2016, a search warrant for the parcel was issued. Id. ¶ 5. At approximately 3:00 p.m. on that same date, the parcel was searched and a large quantity of methamphetamine was found in the parcel. Id. ¶ 6. Thereafter, an application for a warrant authorizing the use of a tracking and beeper device was prepared, and the warrant was issued at approximately 9:40 a.m. on August 4, 2016. Id. ¶ 7.

The methamphetamine inside the parcel was replaced with pseudo-methamphetamine and a beeper and tracking device were installed inside the parcel. Id. ¶ 8. The parcel was also dusted with "Sirchie" powder on the inside, which becomes visible when exposed to ultraviolet light. Id.

Jensen Rodrigues, a USPI, acting in an undercover capacity as a United States Postal Service ("USPS") employee, testified that on August 4, 2016, he delivered the parcel containing pseudo-methamphetamine to the post office box that the parcel was addressed to in Honolulu. The parcel was too large to fit into the post office box. Consistent with USPS procedures, USPI Rodrigues testified that he placed a pick-up notice in the post office box. Later that day, DEA officers

surveilling the area observed a black BMW park in the rear parking lot. USPI Rodrigues testified that on August 5, 2016 he viewed surveillance footage from the post office on August 4, 2016 and identified Defendant William Notyce as the person who entered the post office and checked the post office box. USPI Rodrigues testified that Defendant Notyce opened the post office box and saw the slip but did not pick up the parcel. Officer Echiberi testified that from a parked car outside the post office, he saw Defendant Notyce's face inside his car as he drove away from the post office.

At approximately 10:10 a.m. on August 5, 2016, Keith Matsuda ("Defendant Matsuda") picked up the parcel at the post office. Stip. ¶ 10. In the parking lot, Matsuda delivered the parcel to an unknown male who then passed the parcel to another man, later identified as Chaes Yanagihara ("Defendant Yanagihara"). Id. ¶ 11. HPD drug task force officer Kyle Echiberi testified at the hearing that law enforcement conducted surveillance of the subject parcel from the post office parking lot to a secured parking lot at 1655 Makaloa Street ("Kapiolani Manor"). See Defendant Exhibit 1 at 000048.

At approximately 10:48 a.m. on August 5, 2016, the beeper within the parcel went off, indicating that the parcel was opened. Id. ¶ 13. Law enforcement officers entered Kapiolani Manor's secured parking structure. Id. ¶ 14. While

5

on the parking structure's third floor, they observed Defendant Notyce walking through the lot toward his car. Id. Law enforcement officers then gave Defendant Notyce verbal commands for him to get on the ground face down, which Defendant Notyce complied without incident. Officer Echiberi testified at the hearing that he and one other officer then placed Defendant Notyce in handcuffs, patted him down for the officers' safety, and found a large amount of U.S. currency, a key ring with one house key, a key fob, an electronic garage key, and a BMW key fob. The keys found in Defendant Notyce's possession were later discovered to belong to Apartment #608 of Kapiolani Manor.

Defendant Notyce was notified that he was being detained and was advised of his Miranda rights. Defendant Exhibit 1 at 000049. Defendant Notyce waived those rights and stated that he wanted to cooperate with law enforcement. Id. After speaking with Defendant Notyce for a few minutes, Officer Echiberi testified that the officers used an ultraviolet light to check for signs of the "Sirchie" powder that was inside the parcel. According to Officer Bugarin, the officers first placed Defendant Notyce inside her vehicle to use the ultraviolet light. Because it was too light in that location, they moved Defendant Notyce to a darker location in the garage. There, the officers found traces of the Sirchie powder on his hands while

using the ultraviolet light.  Defendant Notyce was then
arrested.

Around that same time on August 5, 2016, DEA special
agent William Dituro testified at the hearing that he was
informed that the car that drove from the post office to
Kapiolani Manor was parked in a spot associated with an
apartment on the sixth floor.  He also testified that he then
went up to the sixth floor and through a monitor he could
determine that there was a good possibility that the beeper and
tracking device were located there.  Agent Dituro testified that
he then went back downstairs to the security office and that he
was informed by the security officer that Defendant Notyce's BMW
was parked in the stall that was assigned to Apartment #608.[2]
While reviewing surveillance footage via a closed circuit camera
system, Agent Dituro testified that he discovered that Defendant
Yanagihara had walked from the vehicle with the parcel and went
to the elevator and proceeded to the sixth floor.  He also was
informed that it appeared that somebody had broken into
Apartment #508.

---

[2] The Court notes that the parking stall chart from
Kapiolani Manor and the rental agreement undermine the accuracy
of the security officer's statement that Defendant Notyce's car
was parked in the stall associated with Apartment #608.
However, the Court finds that Officer Echiberi relied in good
faith on the security officer's assertion.

Around that same time on that same date, Officer Echiberi testified that he and two other members of law enforcement knocked on the door of Apartment #608 and announced "Police, open the door" approximately four times. Hearing no response, they checked the door, which was unlocked. Because Apartment #508 which is directly below Apartment #608 had been burglarized, officers opened the door to check on the status of the apartment and safety of any occupants. The testimony at the hearing was not clear regarding whether the officers knew that the security officer at Kapiolani Manor had informed Agent Dituro that Defendant Notyce's BMW was parked in the stall that was assigned to Apartment #608 when they entered Apartment #608. Upon opening the door, officers were able to observe the contents of the subject parcel on a table in the kitchen along with the parcel box on the ground. Defendant Exhibit 1 at 000051. At the hearing, Officer Echiberi testified that he also observed a TV on the floor, an inflatable bed, and a bathroom with towels hanging inside the apartment. On cross examination, Officer Echiberi also testified that he did not see safes near the bed. The officers confirmed that there were no occupants in the apartment.

At approximately 5:15 p.m. on August 5, 2016, a search warrant for Apartment #608 and the BMW at Kapiolani Manor was granted. Stip. ¶ 19. A warrant search was conducted and

resulted in the seizure of evidence, including some methamphetamine and other drugs and approximately $552,000 in U.S. currency.  Defendant Exhibit 1 at 000053.

At approximately 1:40 p.m. on August 10, 2016, law enforcement officers obtained a warrant to search Defendant Notyce's residence at 1039 Hilala Street in Honolulu, Hawaii. The search warrant was executed and an undisclosed amount of U.S. currency, electronic equipment, and documents were seized. Defendant Exhibit 5.

## I.   The Parcel

Defendant Notyce appears to argue that law enforcement unlawfully seized the parcel on August 2, 2016.  Defendant contends that there was not reasonable suspicion that the parcel contained contraband when it was originally seized and that the canine alert after the parcel's seizure was unlawful. Defendant further argues that the parcel's seizure and removal from the delivery process was not justified.  The Court addresses each of these arguments herein.

### a. Whether Defendant Notyce has Standing to Contest Detention and Search of the Parcel

The Court finds that Defendant does not have standing to challenge any search and seizure of the parcel because he did not have a legitimate expectation of privacy in it.  The Fourth Amendment provides that persons shall be "secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment protects against "not all searches and seizures, but unreasonable searches and seizures." Terry v. Ohio, 392 U.S. 1, 8 (1968) (quoting Elkins v. United States, 364 U.S. 206, 222 (1960)). To contest the legality of a search under the Fourth Amendment, "the defendant must demonstrate a legitimate expectation of privacy in the place or item searched by showing an actual subjective expectation of privacy which society is prepared to recognize." United States v. Davis, 932 F.2d 752, 756 (9th Cir. 1991); see United States v. Lozano, 623 F.3d 1055, 1062 (9th Cir. 2010) (O'Scannlain, J. concurring) ("It is axiomatic that to claim the protections of the Fourth Amendment, defendants must demonstrate that they had an expectation of privacy in the property searched and that their expectation was reasonable." (internal quotation marks and citation omitted)). It is the defendant's burden to establish that the search or seizure violated his legitimate expectation of privacy in a particular place under the totality of the circumstances. See Rawlings v. Kentucky, 448 U.S. 98, 104 (1980).

"Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy." United States v. Jacobsen, 466 U.S. 109, 114 (1984). A sender of a package "retains a limited

possessory interest in the mailed item," and a parcel's
addressee "has a reasonable expectation that the mail will not
be detained by postal employees beyond the normal delivery date
and time." United States v. Hernandez, 313 F.3d 1206, 1209-10
(9th Cir. 2002). Generally, however, "a third party who is
neither the sender nor the addressee of a mailed package does
not share this privacy interest." United States v. Sheldon, 351
F. Supp. 2d 1040, 1043 (D. Haw. 2004) (citing United States v.
Pierce, 959 F.2d 1297, 1303 (5th Cir. 1992)).[3]

Here, Defendant Notyce was neither the sender nor the
addressee of the package. The parcel was not addressed to him

---

[3] The Ninth Circuit "has not decided whether an individual
has a legitimate expectation of privacy with respect to a
package that is not addressed to him." United States v. Lozano,
623 F.3d 1055, 1062 (9th Cir. 2010) (O'Scannlain, J.
concurring). In an unpublished, nonprecedential decision,
however, the Ninth Circuit held that a defendant did not have a
legitimate expectation of privacy in a package addressed to a
co-resident of his home and that defendant did not have a
privacy interest even though he was participating in an
"arrangement" with other defendants. United States v. Perez, 64
F. App'x. 635, 636 (9th Cir. 2003) (per curiam).
    Furthermore, other circuits have held that an individual
does not have a legitimate privacy expectation in a package that
is not addressed to him. See, e.g., United States v. Smith, 39
F.3d 1143, 1145 (11th Cir. 1994); United States v. Daniel, 982
F.2d 146, 149 (5th Cir. 1993); United States v. Koenig, 856 F.2d
843, 846 (7th Cir. 1988); United States v. Givens, 733 F.2d 339,
341-42 (4th Cir. 1984). One judge in the Ninth Circuit
has stated in a concurring opinion, "I would follow the weight of
authority, and hold that an individual does not have a
legitimate expectation of privacy in a package not addressed to
him." United States v. Lozano, 623 F.3d 1055, 1063 (9th Cir.
2010) (O'Scannlain, J. concurring).

or a physical location associated with him.  Defendant Notyce

did not retrieve the parcel from the post office box or display

any other conduct that would demonstrate a privacy interest in

the parcel's contents.  At minimum, Defendant Notyce used three

separate people—Defendant Yanagihara, Defendant Matsuda, and an

intermediary who was not charged in the indictment—to deliver

the parcel to him.  Accordingly, the Court finds that Defendant

Notyce did not have a legitimate expectation of privacy in the

parcel and therefore does not have standing to challenge its

search and detention.  See Schulze v. United States, No. CR 02-

00090 DAE, 2011 WL 4590391, at *11 (D. Haw. Sept. 30, 2011)

("Petitioner has not shown that he had an individual expectation

of privacy in the Fukumoto package outside of his connections

with his alleged co-conspirators who handled the package . . .

Since petitioner did not have an individual expectation of

privacy or property interest in the package, he would not have

had standing to move to suppress the drugs on Fourth Amendment

grounds . . .").

> **b. Whether the Parcel was Properly Subjected to a Canine
>    Sniff**

The Court further finds that even if, assuming

arguendo, Defendant Notyce had standing to complain of the

search and detention of the parcel, the postal inspectors had

reasonable suspicion to detain the parcel to conduct an

investigation.  Postal inspectors may detain a package to conduct an investigation "if they have a reasonable and articulable suspicion" that it contains contraband or evidence of illegal activity.  United States v. Aldaz, 921 F.2d 227, 229 (9th Cir. 1990).  To determine whether reasonable suspicion exists, reviewing courts "must look at the 'totality of the circumstances' . . . to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  United States v. Arvizu, 534 U.S. 266, 273 (2002).  Although the determination of reasonable suspicion is fact-specific, the circumstances taken together must be evaluated as they would be "understood by those versed in the field of law enforcement."  United States v. Cortez, 449 U.S. 411, 418 (1981).

In the present case, the postal inspector had a reasonable and articulable suspicion to detain the package for a drug dog sniff test.  In the USPI's affidavit for a search warrant, he explained that based on his knowledge, training, and experience, and that of other law enforcement experienced in drug investigations, there were several indicia of the presence of controlled substances inside the package.  First, the USPI observed that the parcel was sent from California, which is a known source state.  Second, the parcel was sealed with tape around the main seam, which the USPI noted was a possible

13

attempt to conceal the distinctive smell of controlled

substances from narcotics detector dogs.  Stip. ¶ 3b.  Third,

other densely packed items inside the parcel were revealed when

the USPI shook it.  Id. ¶ 3a.  Fourth, the UPSI could not

confirm the name of the return addressee.  Id. ¶ 3c.  Drug

traffickers often use fictitious names to conceal their

identities.  In sum, when examining the totality of the

circumstances, the Court finds that the USPI had a reasonable

suspicion sufficient to justify his detention of the package so

that a narcotics detector dog could smell it.  Because the USPI

had reasonable suspicion to detain the package, the Court

concludes that the initial seizure was not unreasonable under

the Fourth Amendment.

Furthermore, the parcel was not detained for a

prolonged period of time before or after the canine sniff.

"Even if the initial seizure of a mailed package is based on

reasonable suspicion, a prolonged detention is unreasonable

under the Fourth Amendment."  United States v. Hernandez, 313

F.3d 1206, 1212 (9th Cir. 2002) (holding that a seven hour

interference with Defendant's possessory interest, prior to

obtaining probable cause to seize the package, was not

unreasonable under the circumstances); see also United States v.

Gill, 280 F.3d 923, 929 (9th Cir. 2002) (holding that a six day

delay between the first inspection of the package and the

authorization of a search warrant was reasonable).[4]  The court

must determine under the facts of each case whether the delay in

detaining the package was reasonable.  See United States v.

Aldaz, 921 F.2d 227, 229-30 (9th Cir. 1990).

The Court finds that in the present case there was no

unreasonable delay.  The package was inspected on August 2, 2016

and identified at approximately 8:15 p.m. on that date.  The dog

sniff occurred at 8:36 p.m.  Any delay, if one occurred, between

when the parcel was inspected and sniffed by the narcotic

detector dog was minimal.  Thereafter, an application for a

search warrant for the parcel was prepared.  At approximately

1:50 p.m. on August 3, 2016, a search warrant for the parcel was

issued.  The delay between the dog sniff and the issuance of

the search warrant was minimal and can be largely attributed to

the administrative requirements in preparing a search warrant.

See id. ("[T]he five hours between the drug sniffs and the

execution of the warrants did not constitute an unreasonable

delay.  It was largely attributable to the administrative

requirements for securing search warrants.").

---

[4] The Ninth Circuit has characterized "the possessory
interest in a mailed package as being solely in the package's
timely delivery."  United States v. Jefferson, 566 F.3d 928, 933
(9th Cir. 2009) (internal quotation marks omitted).  Thus, the
possessory interest does not involve having a "package routed on
a particular conveyor belt, sorted in a particular area, or
stored in any particular sorting bin for a particular amount of
time."  Id. (internal quotation marks omitted).

**c. Whether the Parcel's Seizure and Removal from the Delivery Process was Justified**

Defendant Notyce argues that the parcel's "seizure and removal from the delivery process by the Postal Inspectors was not justified." Motion at 8. To the extent Defendant Notyce is referring to the detention of the parcel prior to the canine sniff, the Court finds that it was lawful for the reasons previously discussed. The Court notes that the detention of the package after the canine alert to the parcel was proper. <u>See United States v. Quoc Viet Hoang</u>, 486 F.3d 1156, 1160 n.1 (9th Cir. 2007) ("We note that Otto's alert to the package created probable cause to believe that the package contained illicit drugs. Probable cause is sufficient to support the subsequent detention of the package." (internal citations omitted)). The Court, therefore, finds that there was probable cause because of the canine alert. The aforementioned evidence was then used to justify the issuance of the search warrant.

In light of the foregoing, the Court denies Defendant Notyce's motion to suppress evidence from the inspection and detention of the parcel.

**II. The Evidence from Defendant's Pants Pocket**

Defendant Notyce argues that the evidence retrieved from his pants pockets before he was arrested should be suppressed. The Fourth Amendment permits brief investigative

stops when a law enforcement officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). The "reasonable suspicion" necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability." Alabama v. White, 496 U.S. 325, 330 (1990). The standard takes into account "the totality of the circumstances—the whole picture." Cortez, 449 U.S. at 417. Although a mere hunch does not create reasonable suspicion, Terry, 392 U.S. at 27, the level of suspicion the standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause. United States v. Sokolow, 490 U.S. 1, 7 (1989). Reasonable suspicion is present when an officer can "point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the intrusion." Terry, 392 U.S. at 21.

The Court finds that the officers had probable cause to believe, and therefore a reasonable suspicion, that Defendant Notyce was involved in narcotics trafficking. "Probable cause exists when the facts and circumstances within an officer's knowledge are sufficient for a reasonably prudent person to believe that the suspect has committed a crime." Reed v.

<u>Lieurance</u>, 863 F.3d 1196, 1204 (9th Cir. 2017) (internal quotation marks and citation omitted).  Reasonable suspicion exists when articulable facts support that criminal activity may be afoot.  <u>See</u> <u>Sokolow</u>, 490 U.S. at 7.  At the time the agents observed Defendant Notyce in the garage of Kapiolani Manor, they already knew the following: (1) that the parcel mailed to the P.O. Box in Honolulu contained a substantial quantity of methamphetamine; (2) that Defendant Notyce had checked that P.O. Box the same day it was delivered to the P.O. Box; (3) that someone had opened the parcel a few minutes earlier; and (4) that Defendant Notyce was in the garage of the building where the parcel was opened.  Based on this information, the officers not only had reasonable suspicion to believe that Defendant Notyce was involved in narcotics trafficking but also had probable cause.

Whereas a <u>Terry</u> stop is justified by reasonable suspicion that criminal activity may be afoot, a frisk of a person for weapons requires reasonable suspicion that a suspect "is armed and presently dangerous to the officer or to others." <u>Terry</u>, 392 U.S. at 24; <u>see</u> <u>id.</u> at 30.  The Ninth Circuit has held that mere suspicion that someone has committed a narcotics trafficking crime warrants a pat down search because such crimes are so frequently associated with weapons.  <u>See</u> <u>United States v. Davis</u>, 530 F.3d 1069, 1082-83 (9th Cir. 2008) ("Because officers

18

reasonably suspected that Richard Davis was involved in
narcotics activity, it was also reasonable for them to suspect
that he might be armed."); United States v. Flatter, 456 F.3d
1154, 1158 (9th Cir. 2006) (stating that some crimes are so
frequently associated with weapons, such as large scale
narcotics dealing, that the mere suspicion that an individual
has committed them justifies a pat down search); United States
v. Thomis, No. 2:05-CR-0175-PMP-GWF, 2006 WL 2039971, at *4 (D.
Nev. July 20, 2006) ("Certain suspected offenses, such as . . .
dealing in large quantities of narcotics are sufficient, without
other suspicious circumstances, to justify a Terry pat-down
search for weapons.").  As previously discussed, the officers
had probable cause to believe that Defendant Notyce had
committed a narcotics trafficking crime.  Accordingly, pursuant
to the aforementioned Ninth Circuit authority, the officers
permissibly frisked him for weapons.

     The Court, however, finds the issue of whether the
evidence seized—$4,316 in US currency, keys, and key fobs—was
within the scope of a permissible Terry frisk to be a closer
call.  A Terry frisk must be limited to the discovery of weapons
which might be used to harm officers or others.  Minnesota v.
Dickerson, 508 U.S. 366, 373 (1993).  This protective search
must be strictly "limited to that which is necessary for the
discovery of weapons which might be used to harm the officer or

others nearby." <u>Terry</u>, 392 U.S. at 26. If the protective

search goes beyond what is necessary to determine if the suspect

is armed, it is no longer valid under <u>Terry</u> and its fruits will

be suppressed. <u>Minnesota</u>, 508 U.S. at 373. During the course

of a lawful pat-down, if an officer feels an item he recognizes

as contraband or evidence, the officer may seize the item. <u>Id.</u>

at 375. The "incriminating character" of the item must be

"immediately apparent." <u>Id.</u>[5] The Court finds that although the

officers' seizure of the currency was lawful, the officers'

seizure of the keys and key fobs was not.[6] The incriminating

character of a large amount of currency, especially in the

---

[5] In <u>Dickerson</u>, the Supreme Court held that the crack
cocaine seized from a defendant's pocket was the product of an
unlawful search because the officer had already determined that
the defendant's pocket did not contain a weapon when he
"squeez[ed], slid[ ] and otherwise manipulate[ed] the contents
of the defendant's pocket" to determine the item's incriminating
character. <u>Id.</u> at 378.
    In addition, the Ninth Circuit held that a small box
containing ammunition should have been suppressed when it was
discovered by a pat down which exceeded the "strictly
circumscribed limits of <u>Terry</u>." <u>United States v. Miles</u>, 247
F.3d 1009, 1015 (9th Cir. 2001) (internal quotation marks
omitted). In <u>Miles</u>, while performing a <u>Terry</u> patdown, an
officer felt a small box about one-half the size of a package of
cigarettes. <u>Id.</u> at 1014. The record did not indicate that the
officer immediately recognized the box as contraband. <u>Id.</u> at
1014-15. Rather, the officer impermissibly continued to squeeze
and manipulate the box, at which point, he determined that it
contained ammunition. <u>Id.</u> at 1015.
    [6] The Court notes that although the Government argued that
the officers could have believed that the keys were to be used
as weapons, there is no testimony in the record to support this
contention.

20

context of a suspected drug crime, is immediately apparent.  The
Court, however, finds that the incriminating character of the
keys and key fobs was not immediately apparent and therefore its
seizure exceeded the scope of a permissible Terry frisk.

The Government, however, argues that even if the items
seized during the scope of the pat-down exceeded the scope of a
Terry frisk, the officers conduct was lawful because they would
have inevitably discovered the evidence during a search incident
to Defendant Notyce's arrest that occurred ten minutes later.
The Court agrees.

"The inevitable discovery doctrine creates an
exception to the exclusionary rule where the government
establishes by a preponderance of the evidence that the
unlawfully obtained information inevitably would have been
discovered by lawful means."  United States v. Williams, 161 F.
Supp. 3d 846, 854 (N.D. Cal. 2016); see United States v. Reilly,
224 F.3d 986, 994 (9th Cir. 2000).  As previously discussed, the
officers had probable cause to arrest Defendant Notyce when they
saw him in the garage of Kapiolani Manor, before they seized
evidence of a large quantity of currency, keys, and key fobs.
The officers would have discovered the evidence in Defendant
Notyce's pants pockets incident to his lawful arrest.  See
United States v. Robinson, 414 U.S. 218, 224 (1973) ("It is well
settled that a search incident to a lawful arrest is a

traditional exception to the warrant requirement of the Fourth
Amendment . . . a search may be made of the person of the
arrestee by virtue of the lawful arrest . . . of the area within
the control of the arrestee."). Accordingly, the Court denies
Defendant Notyce's motion to suppress evidence retrieved from
his pants pockets.

## III. The Use of Ultraviolet Light to Look for Traces of "Sirchie" Powder

Defendant contends that the "Sirchie" powder
observations, only visible through the use of special light,
should be suppressed. The Court disagrees.

Officers Echiberi and Bugarin testified regarding the
use of the ultraviolet light to look for traces of Sirchie
powder. The Court finds that it was lawful. Most courts that
have addressed the issue of whether an ultraviolet light or
similar test of a person is a search within the meaning of the
Fourth Amendment have held that it is not. See United States v.
Ukomadu, 236 F.3d 333, 338 (6th Cir. 2001) (discussing Sixth
Circuit precedent holding that the examination of defendant's
hands under ultraviolet light was not a search within the
meaning of the Fourth Amendment); United States v. Williams, 902
F.2d 678, 680-81 (8th Cir. 1990) (agreeing with the district
court's conclusion that the ultraviolet light examination did
not constitute a Fourth Amendment search); Williams v. City of

Lancaster, Pa., 639 F. Supp. 377, 382 (E.D. Pa. 1986)
("The black light examination was . . . not a search within the
meaning of the fourth amendment."); United States v. Millen, 338
F. Supp. 747, 753 (E.D. Wis. 1972) ("[A]n examination by law
enforcement agents of a person's hands under a fluorescent light
while he is in custody does not constitute a search subject to
Fourth Amendment constraints."); but see United States v.
Kenaan, 496 F.2d 181, 182 (1st Cir. 1974) ("There can be little
doubt that an inspection of one's hands, under an ultraviolet
lamp, is the kind of governmental intrusion into one's private
domain that is protected by the Fourth Amendment.").[7]

        This Court follows the majority of courts in finding
that the officers' use of ultraviolet light to look for traces
of Sirchie powder was not a search within the meaning of the
Fourth Amendment.  The use of ultraviolet light examination is
similar to the use of fingerprinting and voice exemplars, which
does not violate the Fourth Amendment.  See United States v.
Williams, 902 F.2d 678, 680-81 (8th Cir. 1990).  In addition, as
one court noted, Defendant Notyce did not have a "reasonable
expectation of privacy regarding the surface of his hands, which
were exposed to the view of all about him.  Although the ultra-
violet light disclosed fluorescent traces invisible to the

_____

        [7] The Court notes that the Ninth Circuit has not yet
addressed this issue.

public, the mere shining of this light did not involve an intrusion below the bodily surface." <u>Williams</u>, 639 F. Supp. at 382.

Furthermore, the Court finds that even if, assuming <u>arguendo</u>, the use of ultraviolet light was a search under the Fourth Amendment, it would still be lawful under the exigent circumstances exception. "It is well established that 'exigent circumstances,' including the need to prevent the destruction of evidence, permit police officers to conduct an otherwise permissible search without first obtaining a warrant." <u>Kentucky v. King</u>, 563 U.S. 452, 455 (2011); <u>see</u> <u>Missouri v. McNeely</u>, 569 U.S. 141, 148-49 (2013) (noting that exigent circumstances, such as the need to prevent the imminent destruction of evidence, is an exception to the warrant requirement). Courts have held that even if an ultraviolet light examination were a search, its warrantless use is justified by exigent circumstances because the Defendant could have washed off the powder before a search warrant for his person could have been obtained. <u>See</u> <u>United States v. Williams</u>, 902 F.2d 678, 681 (8th Cir. 1990); <u>see also Los Angeles Police Protective League v. Gates</u>, 579 F. Supp. 36, 46 (C.D. Cal. 1984) (holding in a civil case that even if a black light search fell within the scope of the Fourth Amendment, it still would have been reasonable in part because investigators needed to act quickly because the guilty officers

could wash their hands and destroy the evanescent evidence).[8]
The Court finds that because probable cause and exigent
circumstances existed here, the officers' use of ultraviolet
light to look for Sichie powder was lawful.  Accordingly, the
Court denies Defendant Notyce's motion to suppress evidence
obtained from the officers' ultraviolet light examination.

## IV.  Whether Evidence from Apartment #608 was Lawfully Obtained

### a. Whether Defendant Notyce has Standing to Challenge the Search of Apartment #608

As previously discussed in Part I.a, to contest the
legality of a search under the Fourth Amendment, "the defendant
must demonstrate a legitimate expectation of privacy in the
place or item searched by showing an actual subjective
expectation of privacy which society is prepared to recognize."
United States v. Davis, 932 F.2d 752, 756 (9th Cir. 1991)
(internal quotation marks and citation omitted).  It is the
defendant's burden to establish that the search or seizure
violated his legitimate expectation of privacy in a particular
place under the totality of the circumstances.  Rawlings v.
Kentucky, 448 U.S. 98, 104 (1980).

---

[8] The Ninth Circuit has also held in an unreported case that
"Whether or not the use of a black light to identify the
presence of iridescent powder on [Defendant]'s hands is a
'search,' it was justified by exigent circumstances.  The
district court's finding that [Defendant] could have easily
rubbed the powder off his hands was not clearly erroneous."
United States v. Jones, 176 F. App'x 809, 811 (9th Cir. 2006).

The Court finds that Defendant Notyce does not have standing to challenge the search of Apartment #608 at Kapiolani Manor. There is no evidence in the record that Defendant Notyce owned the apartment, lived at the apartment, was a lessor of the apartment, or was an overnight guest at the apartment. Although the Government acknowledged at the hearing that Defendant Notyce used and had access to the apartment and kept a safe there, the Court finds that this is insufficient by itself to establish that Defendant Notyce had an expectation of privacy in the apartment. The Court finds Defendant Notyce used the apartment for commercial purposes; namely for illegal drug operations, with the subject parcel and a large amount of methamphetamine and a large amount of currency in two safes found in the apartment. Defendant Exhibit 22, 23. There was no evidence that Defendant Notyce had joint control or supervision of the apartment and the tenant lease was in the name of Czarina Radlick. Defendant Exhibit 21.

At the hearing, Defense counsel discussed United States v. Davis, 932 F.2d 752 (9th Cir. 1991) and United States v. Johns, 851 F.2d 1311 (9th Cir. 1988) to support his position that Defendant Notyce had a legitimate expectation of privacy in Apartment #608. The Court, however, finds these cases distinguishable. In Davis, the court held that defendant had standing because he, inter alia, previously lived in the

apartment, paid a portion of the rent for the apartment, and had a key to the apartment. 932 F.2d at 757. In Johns, the court held that defendant had standing because he was a co-owner of items found in the space and paid a portion of the rent. 851 F.2d at 1136. Here, however, as previously discussed, there is no evidence that Defendant Notyce ever lived in Apartment #608 or paid a portion of the rent.

Therefore, Defendant Notyce has failed to meet his burden to show that he had a reasonable expectation of privacy in Apartment #608. See Minnesota v. Carter, 525 U.S. 83, 88-91 (1998) (holding that defendants who used an apartment for manufacturing drugs were using the apartment for commercial purposes and only occupied it for a short time for the purpose of packaging drugs for resale had no legitimate expectation of privacy in that apartment); United States v. Paopao, 469 F.3d 760, 764 (9th Cir. 2006) (holding that a defendant lacked Fourth Amendment standing to challenge the search of an apartment used as an illegal gambling room where nobody lived in the apartment and defendant's presence in room was for a commercial and possibly criminal purpose); United States v. Reyes-Bosque, 463 F. Supp. 2d 1138, 1143-44 (S.D. Cal. 2006), aff'd, 596 F.3d 1017 (9th Cir. 2010) (holding that defendant did not have a legitimate expectation of privacy in the unit, which was technically a residence, but was used for commercial purposes as

a load house for alien smuggling). Accordingly, the Court finds
that Defendant Notyce lacks standing to challenge the entry by
law enforcement officers into, or the search of, Apartment #608.

### b. Whether the Warrantless Entry into Apartment #608 was Lawful

Even if Defendant Notyce had standing to challenge the
entry and search of Apartment #608, the warrantless entry and
search by law enforcement officers of Apartment #608 was lawful.
Warrantless searches by law enforcement officials "are per se
unreasonable under the Fourth Amendment—subject only to a few
specifically established and well-delineated exceptions." Katz
v. United States, 389 U.S. 347, 357 (1967). The burden is on
the Government to persuade the district court that a seizure
comes "'under one of a few specifically established exceptions
to the warrant requirement.'" United States v. Hawkins, 249
F.3d 867, 872 (9th Cir. 2001) (quoting United States v. Huguez-
Ibarra, 954 F.2d 546, 551 (9th Cir. 1992)).

The Government argues that the warrantless entry into
Apartment #608 was justified by the emergency doctrine. "To
determine whether the emergency exception applies to a
particular warrantless search, we examine whether: '(1)
considering the totality of the circumstances, law enforcement
had an objectively reasonable basis for concluding that there
was an immediate need to protect others or themselves from

serious harm; and (2) the search's scope and manner were reasonable to meet the need.'" <u>Ames v. King Cty., Washington</u>, 846 F.3d 340, 350 (9th Cir. 2017) (quoting <u>United States v. Snipe</u>, 515 F.3d 947, 952 (9th Cir. 2008)); <u>see United States v. Reyes-Bosque</u>, 596 F.3d 1017, 1029 (9th Cir. 2010).[9]

At the hearing, Officer Echiberi testified that he entered Apartment #608 because he knew that Apartment #508, which was directly below it, had been burglarized. Specifically, the officers entering Apartment #608 believed that Apartment #508 had been broken into through the lanai, which,

---

[9] The Court notes that the Government's Opposition discusses the incorrect standard. In <u>United States v. Cervantes</u>, 219 F.3d 882 (9th Cir. 2000), the Ninth Circuit identified three requirements for application of the emergency doctrine:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

<u>Cervantes</u>, 219 F.3d at 888. In <u>United States v. Snipe</u>, 515 F.3d 947 (9th Cir. 2008), the court reconsidered its prior decision in <u>Cervantes</u> regarding the appropriate Fourth Amendment standard governing warrantless entry by law enforcement in an emergency situation in light of the Supreme Court case <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398 (2006). In place of <u>Cervantes</u>, the Ninth Circuit adopted a two-pronged test that the Court discusses herein. <u>See United States v. Snipe</u>, 515 F.3d 947, 951-52 (9th Cir. 2008).

given the distance between the lanais, could only have been accessed from the unit above. This was also consistent with the cuts found on Defendant Notyce's feet, hand, and arm when the officers arrested him, which the officers suspected occurred because Defendant Notyce jumped onto Apartment #508's lanai from above. Given the burglary and its suspected connection to Apartment #608, the officers had a reasonable need to protect others or themselves from individuals, such as a suspect or victim, in Apartment #608. In addition, Officer Echiberi testified that the man carrying the parcel had been seen on the sixth floor. The door to Apartment #608 was also unlocked, which triggered additional concern from the officers because the apartment was located in a high rise building in Honolulu. Based on these facts, the Court finds that the first prong of the emergency exception has been satisfied: the officers had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm.

In addition, the Court finds that the search's scope and manner were reasonable to meet the need, which establishes the emergency doctrine's second prong. Officer Echiberi testified that the officers were in Apartment #608 for approximately thirty seconds to determine whether anyone was inside the apartment.

The Government also argues that the officers' search of Apartment #608 was lawful because there could have been an additional suspect in the apartment in regard to the drug crime, such as Defendant Yanagihara, and that person was likely to flee and/or destroy evidence. Given that the officers knew that other individuals besides Defendant Notyce were involved in the suspect drug crime, the Court finds this argument convincing.

Accordingly, the Court finds that the warrantless entry into Apartment #608 was lawful under the emergency doctrine and the exigent circumstances exception to the warrant requirement.

### c. Whether the Application for a Warrant to Search Apartment #608 was Lawful

Defendant Notyce argues that the warrant to search Apartment #608 "was obtained with tainted and recklessly or intentionally untrue (or materially omitted) information" regarding their earlier warrantless search of #608 and their illegal search of Mr. Notyce's person. Motion at 7. Defendant, however, fails to point to any statements in the affidavit that were untrue. Defendant only argues that the affidavit omitted material information.[10]

---

[10] See Motion at 8-9 (the officers "omitted the material details of having previously entered the closed apartment and having observed its contents including the items in plain view that were later the subject of 'warranted search'"); id. at 9

(continued . . . )

Defendant Notyce's arguments regarding material

omissions are summarized, which the Court discusses in more

detail in Footnote 10, as follows: (1) the officers failed to

explain the circumstances in which they observed "Sirchie"

powder on Defendant Notyce's hands; (2) the officers failed to

explain that they entered Apartment #608 without a warrant and

observed the parcel in plain view; (3) the officers failed to

explain that when they entered Apartment #608 they did not know

that the BMW was parked in the stall assigned to that unit; (4)

the officers failed to explain that they had seized

incriminating evidence from Defendant Notyce.

---

("They also failed to disclose that Mr. Notyce had been searched
in the parking lot, that incriminating items taken from his
pockets were seized, and that his hands were observed twice by
use of a special light seeking evidence of 'Sirchie' powder that
was not in plain view, all before his arrest."); id. at 10
("[T]he police intentionally omitted the fact of their prior
entry and survey of apartment #608 . . ."); id. ("[L]aw
enforcement did not inform the Court that they had already
entered and gone throughout apartment #608; instead they merely
say they observed the subject parcel when 'securing' the
apartment."); id. ("The agents intentionally or recklessly
omitted telling of their prior entry and observations of the
contents of apartment #608 when applying for the warrant."); id.
at 10-11 ("[T]he warrant application does not disclose that, at
the time they entered apartment #608, the agents did not know
that the BMW was parked in the stall assigned to that unit.");
id. at 11 ("Nor did they disclose to the Court their excuse for
the warrantless entry into apartment #608, a reported
unauthorized entry apartment #608, a reported unauthorized entry
of the unit below, on the fifth floor, apartment #508."); id.
("Further, the agents did not disclose how and when they
observed traces of 'Sirchie' powder, by search of his person
with a special light, twice, before his arrest.").

The Court finds that statements in the warrant affidavit undermine two of Defendant Notyce's claims. First, the affidavit supporting the warrant application states, "While agents and officers were on the first floor NOTYCE is seen walking through the parking lot and is subsequently detained . . . NOTYCE's hands were checked with a florescent light for signs of 'Sirchie' powder. Small traces of 'Sirchie' powder were discovered on NOTYCE's hands." Ex. 4, Affidavit ¶ 21. Contrary to Defendant's argument, the affidavit, therefore, explains the circumstances in which the officers observed "Sirchie" powder on Defendant Notyce's hands.[11] Second, as previously discussed, the affidavit supporting the warrant application to search Apartment #608 states, "While securing the apartment, agents and officers observed the subject parcel and its contents on the kitchen table." Id. ¶ 23. Again, contrary to Defendant's argument, the affidavit, therefore, explains that the officers entered Apartment #608 without a warrant and observed the parcel in plain view.[12]

---

[11] As previously discussed, at the hearing, Officer Bugarin, testified that the officers first placed Defendant Notyce inside her vehicle to use the ultraviolet light. Because it was too light in that location, they moved Defendant Notyce to a darker location in the garage. There, the officers found traces of the Sirchie powder on his hands.

[12] Defendant argues that,"[L]aw enforcement did not inform the Court that they had already entered and gone throughout apartment #608; instead they merely say they observed the
(continued . . . )

In regard to Defendant Notyce's third argument—that the officers failed to explain that when they entered Apartment #608 they did not know that the BMW was parked in the stall assigned to that unit—the Court finds that this information is immaterial. The affidavit does state that agents and officers made checks with the property manager and it was discovered that the Defendant Notyce's BMW was parked in the stall that belonged to Apartment #608. The Court finds that whether the agents learned of this before or after they entered Apartment #608 is not material here.[13] See United States v. Kyllo, 37 F.3d 526, 529 (9th Cir. 1994) ("[Defendant] must demonstrate that had there been no omission, the affidavit would have been insufficient to establish probable cause."). The affidavit sufficiently establishes probable cause regardless.

---

subject parcel when 'securing' the apartment." Motion at 10. The Court finds the distinction that Defendant makes on this issue to be unpersuasive and therefore does not find that the affidavit omitted any information on this issue.

[13] The Court notes that the record is not clear as to whether the officers who entered Apartment #608 knew at the time of their entry that the security officer in Kapiolani Manor had told other law enforcement officers that Defendant Notyce's car was parked in the stall associated with Apartment #608.

The Court also notes that at the hearing Defense counsel correctly pointed out that the parking stall chart from Kapiolani Manor and the rental agreement undermined the accuracy of the security officer's statement to Agent Dituro—that Defendant Notyce's car was parked in the stall associated with Apartment #608. Although the security officer erroneously made this statement, the Court finds that Agent Dituro believed it in good faith.

The Court agrees with Defendant Notyce that the officers failed to explain that they had seized incriminating evidence from Defendant Notyce's person. However, the Court finds that this omitted information would only provide further evidence of probable cause to support the warrant and therefore is not a material omission.

In sum, the Court finds that Defendant Notyce does not have standing to challenge evidence seized from Apartment #608. Even if, assuming _arguendo_, Defendant Notyce did have standing, the warrantless entry was lawful and the subsequent warrant applications did not contain material omissions or misstatements. Therefore, the Court denies Defendant Notyce's motion to suppress the evidence from Apartment #608.

## V. Whether Evidence from 1039 Hilala Street was Lawfully Obtained

Defendant Notyce argues that what he claims is a "cascading list of unconstitutional searches and seizures, which are repeated within the August 10, 2016 application for a warrant . . . render" the search of his residence at 1039 Hilala Street unlawful for the same reasons. Motion at 12.

As previously discussed, the Court finds that the various searches and seizures that Defendant Notyce refers to were lawful. The affidavit supporting the application for a warrant to search Defendant Notyce's residence at 1039 Hilala

Street did not rely upon the fruit of any unlawful search or seizure that violated Defendant Notyce's constitutional rights. The agents were entitled to rely upon the resulting search warrant when they searched Defendant Notyce's residence. Accordingly, the Court denies Defendant Notyce's motion to suppress the evidence from 1039 Hilala Street.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendant Notyce's Motion to Suppress Evidence, ECF No. 92.


IT IS SO ORDERED

Date: Honolulu, Hawaii, November 6, 2017


Alan C. Kay
Sr. United States District Judge


United States v. William Notyce, Cr No. 16-00556 JMS, Order Denying Defendant's Motion to Suppress Evidence